IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 14, 2007 Session

# IN RE: VICTORIA BOWLING

**Direct Appeal from the Juvenile Court for Anderson County**
**No. J-24936      Hon. Jon Kerry Blackwood, Judge**

**No. E2007-00262-COA-R3-JV  - FILED SEPTEMBER 25, 2007**

Defendant was cited for criminal contempt by Judge.  Another Judge found defendant guilty of contempt.  We affirm.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Juvenile Court Affirmed.**

HERSCHEL PICKENS FRANKS, P.J., delivered the opinion of the court, in which D. MICHAEL SWINEY, J., and SHARON G. LEE, J., joined.

Wade V. Davies and Kimberly A. Pride, Knoxville, Tennessee, for appellant.

Robert E. Cooper, Jr., Attorney General and Reporter, and
Douglas Earl Dimond, Senior Counsel, Nashville, Tennessee, for the State of Tennessee.

## OPINION

This action originated with a Show Cause Order, issued on December 6, 2006, ordering attorney Victoria Bowling to appear before Judge Meldrum, to show cause why she should not be held in contempt for her behavior in Anderson County Juvenile Court on September 8, 2006. A taped transcript of the proceeding in that Court was attached, along with a memo from Judge April Carroll Meldrum, wherein she stated that Ms. Bowling appeared before her on that day as emergency hearings were being conducted (in which she had no involvement) and acted in a manner that was "obstructive, disruptive, interruptive, and derogatory to the Court."

## Background

The record reveals that Bowling ran for Anderson County Juvenile Court Judge in 2006, and was defeated in the Democratic primary by incumbent Judge Hess, and Judge Hess was then defeated in the general election by Judge Meldrum.

Prior to Judge Hess's leaving office, she appointed Ms. Bowling to a number of pending cases either as counsel for an indigent party or as a guardian ad litem, but on the date Judge Meldrum took office, she vacated those orders.

On September 5, 2006, Bowling went to Juvenile Court to get hearings set on three of the cases to which she had been appointed, but was unaware that she had been removed until she was informed on that day. Bowling asked if she could remain as counsel on three of the cases that she felt needed urgent attention, and she "left with the impression that she would be allowed to at least stay on one of the cases where she had been appointed to represent a non-custodial mother, V.B."

Then on September 8, Bowling returned to Juvenile Court and the ensuing events in Court that day led to the contempt citation.

## The Trial

The trial was on January 12, 2007 before Judge Blackwood, and Judge Meldrum was the first witness to testify. She testified that she took office as Juvenile Judge in Anderson County on September 1, 2006, that she had run in the Republican primary, and that Pat Hess, the incumbent, and Ms. Bowling ran in the Democratic primary. Meldrum testified that Hess received the Democratic nomination, but Meldrum prevailed in the general election.

Meldrum testified that Hess cancelled the docket in August, so that when she took office on September 1, she had a "considerable backlog". She testified that after taking office, she learned Hess had appointed Bowling to "every case that needed an appointment" in her last day or so in office, and that Hess had also scheduled 35-40 cases for Meldrum on one day.

Meldrum testified that she was taught at the judicial academy that she should recuse herself from her opponents' cases for an appropriate period, so she recused herself from Hess' cases for 90 days, and from cases involving Bowling and other primary opponents, for 30 days. Meldrum testified that she felt it was not practical to have Bowling appointed on so many pending cases at once, and that she appointed other local attorneys to take over these cases. She further testified that she had never before "laid eyes on" Ms. Bowling, and had never seen her practicing in Anderson County Juvenile Court before.

Meldrum testified that when Bowling came to her Court on September 5, she

explained to Bowling why the appointments were changed, that it was not personal, and that after the 30 day period she advised Bowling that she get on the list to get more appointments.

Meldrum testified that on September 8, which was a Friday, she had some emergency hearings, and that Mr. Leden (who was acting as her bailiff) recorded the proceedings using a "boom box" tape recorder. She testified that a hearing involving Ms. Levy had concluded when Ms. Bowling started talking with her, and that she had another hearing scheduled, and it was then around 4:00 p.m. She said that Bowling wanted to talk about the same issues they had already discussed on Tuesday, and that the timing was inconvenient. She said that Bowling was immediately aggressive, angry and upset, and inquired of her if another judge was going to hear these cases, but Meldrum explained that she had appointed other counsel, so she didn't need to be concerned with the cases. Bowling then told her she was going to represent one of the clients for free, and Meldrum advised that was fine, just to have the client come in and sign a waiver of her right to appointed counsel.

At that point, Meldrum testified that Bowling began making comments that Meldrum's actions were harmful to the litigants, and they should not be punished because of Bowling, and Meldrum again explained that Bowling had not done anything, and it had nothing to do with her personally. Then she said Bowling told her she needed to be a more gracious winner, and that it was all political. Meldrum testified that she admonished Bowling that she needed to show respect for the Court, and that it was getting out of hand, but Bowling continued on, as if she was so angry she couldn't stop. Further, Bowling kept questioning her regarding who she appointed, and whether they had more experience in juvenile court than Bowling, and told her she had more experience in juvenile than Meldrum, and other derogatory things. Meldrum testified that when she advised Bowling that was enough, Bowling replied, "no, it is not."

Meldrum further testified that she started raising her own voice and telling Bowling she had heard enough, and she explained that Bowling "loses it" and started saying that she had asked Meldrum to lunch but she wouldn't go, etc., even though Meldrum kept saying she had heard enough.

Meldrum testified it finally ended when she told Bowling she was in contempt, and Meldrum then left the bench, because she did not have an actual bailiff to take Bowling into custody. She testified that she went to her chambers and waited for Bowling to leave, and then went back and held the hearing, and finished around 8:00 p.m.

The next witness to testify was Cheryl Aslinger, who was in court on September 8th, seeking custody of her grandchildren. She testified that she observed a lady going to the podium to talk to the judge, but she didn't pay attention to what they were saying until things got heated, and she could tell the lady was arguing with the judge, and the judge told the lady she had heard enough, but the lady continued to be belligerent.

Laura Levy was the next witness, and testified she worked as an attorney for DCS, and that she was appearing before Judge Meldrum on Sept. 8 for a preliminary or "three day"

emergency hearing on a matter, and that when her hearing was over, Bowling came up and introduced herself, and had a bunch of papers in her hand that she was waving at Levy, and appeared very angry. Levy testified that Bowling told her she had been appointed on about 20 cases in the last couple of days Judge Hess was in office, and that she had tried to set emergency hearings, but Judge Meldrum wouldn't hear them. Levy testified she didn't know anything about any of this, but Bowling continued telling her that she had gone back to Judge Meldrum to get them set. Levy testified she did not hear the exchange between Bowling and Meldrum, and added that Bowling called and apologized on her voice mail about a week later.

Bowling was the next witness, and she testified that she practiced in Knox and Anderson Counties, and other counties as well. She testified she had never been reprimanded or disciplined by any court or other authority, and that she went to court on Sept. 8, trying to figure out where the order of recusal was, because Judge Murch had told her he could not hear the VB matter without it. Bowling testified that Judge Hess appointed her to several cases between August 22 and 31, and that she began working on three of the cases, one of which was VB. She testified that VB had custody of her child taken from her, had no visitation, and she was attempting to get visitation. Bowling testified that when she went to court on Sept. 5, Judge Meldrum told her she could not stay on the two cases where she was a guardian ad litem, and she then asked if she was still on the VB case, and Judge Meldrum told her only if she didn't think she would have anything before November. Bowling testified that she went to court on September 8, and waited until a hearing was over and then tried to talk to Judge Meldrum, because she wanted an order of recusal so she could get Judge Murch to hear the VB case. Bowling testified that she had listened to the tape of the hearing, and regretted bringing up the lunch invitation or the fact that she thought she had more court experience, but stated that she did not intend disrespect. She testified the judge said something like "I have been in court many times and have not seen you".

Bowling testified the only reason she kept going on was to try to figure out what her client was supposed to do. She said she wanted to at least be able to tell VB who her court-appointed attorney was, but she could not get that information. Bowling admitted that she had not checked with the clerk's office seeking a copy of the recusal order before going to see Judge Meldrum, and admitted that she did not file any motions between September 5 and September 8.

At the conclusion of the hearing, the Trial Judge found that Bowling had been appointed on several cases, and that she knew as of September 5 that her appointments had been vacated, with the possible exception of the VB case. The Court found that when Ms. Bowling came to court on September 8, she was upset, which was borne out by the testimony of the DCS attorney. The Court found that while in the beginning of the conversation between Bowling and Judge Meldrum, they attempted to resolve the issues related to VB, but at some point, the tone changed, and Bowling began to question the court's authority. The Court said that the judge had the right to control her courtroom, and that when Judge Meldrum told Bowling repeatedly that she had heard enough, Bowling responded "no, it is not", and that was contemptuous.

The Court found that when the judge told Bowling again that she had heard enough,

Bowling then began making personal comments about lunch and being a gracious winner and she once again questioned the court's authority. The Court found that Bowling's remarks were derogatory, and she attacked the integrity of the court. He concluded that Bowling's conduct was willful and intentional.

The Trial Court in his Order, held Bowling was in contempt, fined her $1, and suspended the fine.

The issues presented on appeal are:

1.       Whether the evidence established beyond a reasonable doubt that the conduct in question constituted a willful violation of Tenn. Code Ann. §29-9-102?

2.       Whether the defendant was entitled to a jury trial and all other constitutional and statutory rights governing criminal cases if this is to be deemed a criminal offense?

The pertinent statute, Tenn. Code Ann. §29-9-102 states:

The power of the several courts to issue attachments, and inflict punishments for contempts of court, shall not be construed to extend to any except the following cases:

(1) The willful misbehavior of any person in the presence of the court, or so near thereto as to obstruct the administration of justice;

(2) The willful misbehavior of any of the officers of such courts, in their official transactions;

(3) The willful disobedience or resistance of any officer of the such courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of such courts;

(4) Abuse of, or unlawful interference with, the process or proceedings of the court;

(5) Willfully conversing with jurors in relation to the merits of the cause in the trial of which they are engaged, or otherwise tampering with them; or

(6) Any other act or omission declared a contempt by law.

The Supreme Court has observed, criminal contempt causing an obstruction of justice has "generally been defined as any willful misconduct which embarrasses, hinders, or obstructs a court in its administration of justice or derogates the court's authority or dignity, thereby bringing

the administration of law into disrepute." *Black v. Blount*, 938 S.W.2d 394, 399 (Tenn. 1996). Criminal contempt has also been described as occurring "when the dignity and authority of the court has been offended." *Reed v. Hamilton*, 39 S.W.3d 115, 118 (Tenn. Ct. App. 2000).

This Court is required to review the record "to determine if the proof adduced at trial supports the findings of the trier of fact of guilt beyond a reasonable doubt." *Black*, 399. We do not reweigh the proof offered at trial, rather, the "defendant has the burden of illustrating to the Court why the evidence is insufficient to support the verdict." *Id.* The Supreme Court in *Black,* explained, "[a] guilty verdict removes the presumption of innocence and it is replaced with a presumption of guilt. We will not disturb a verdict of guilt for lack of sufficient evidence unless the facts contained in the record and any inferences which may be drawn from the facts are insufficient, as a matter of law, for a rational trier of fact to find the defendant guilty beyond a reasonable doubt." *Id.*

Defendant insists that the Trial Court erred, arguing that the proof did not show that she engaged in "willful misbehavior in the presence of the court, or so near thereto as to obstruct the administration of justice". Rather, she characterizes her conduct as merely zealous advocacy, and cites the case of *State v. Turner*, 914 S.W.2d 951 (Tenn. Crim. App. 1995), as an example of contemptuous behavior. In that case the defendant attorney lost his temper in response to an unfavorable ruling, failed to heed warnings to control himself, raised his voice and made disrespectful comments to the judge, and eventually had to be physically removed from the courtroom, delaying the proceedings and causing a mistrial.

Defendant also relies upon the case of *State v. Green*, 783 S.W.2d 548 (Tenn. 1990), where the Supreme Court reversed the contempt finding against the attorney, apparently due to the history of problems between the defense counsel and the trial judge, finding that the judge's conduct of the trial confirmed his bias and lack of impartiality. *Id*. The key holding in that case was expressed by the Court:

> To the extent that Mr. Green has been proven, beyond a reasonable doubt, to have misbehaved to the extent that he obstructed the administration of justice, we find that it was motivated by his sincere pursuit of the vigorous advocacy he deemed necessary, under the circumstances, to represent a client on trial for his life, and thus was not willful.

*Id.* at 553.

In this case, while Ms. Bowling's intent at the beginning of her conversation with Judge Meldrum was to help her client's position, at some point during the conversation she began asserting a vindication of her own position, especially when she questioned the judge's experience in Juvenile Court, inquired into the judge's motivation behind her refusal to go to lunch, and impugned the judge's character with comments about whether she was a "gracious winner". The exchange became so heated that a bystander litigant described Ms. Bowling's conduct as belligerent. The audio demonstrates that Ms. Bowling repeatedly raised her voice to talk over the judge, not

allowing the judge to explain or accepting the given explanation. The record shows the judge repeatedly said "that is enough", and left the bench for a period of time which resulted in a delay in hearing the remaining cases. This record supports Judge Blackwood's findings and we affirm his Judgment.

Finally, defendant argues that criminal contempt is a criminal conviction, and that pursuant to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), she was entitled to have all the elements of the offense submitted to a jury and proven beyond a reasonable doubt, as well as other constitutional/statutory safeguards. Defendant acknowledges, however, that trial by jury is not required where the criminal contempt proceeding can be classified as "petty". *Bloom v. Illinois*, 391 U.S. 194 (1968). Criminal contempt under Tenn. Code Ann. §29-9-102 has been deemed a "petty" offense by this Court, as the maximum imprisonment for criminal contempt is ten days. *Sliger v. Sliger*, 181 S.W.3d 684 (Tenn. Ct. App. 2005); Tenn. Code Ann. §29-9-103. Accordingly, criminal contempt charges do not trigger a jury trial. *Ahern v. Ahern*, 15 S.W.3d 73 (Tenn. 2000); *Sliger*.

For the foregoing reasons, we affirm the Trial Court's Judgment, with the cost of the appeal assessed to Victoria Bowling.

_____
HERSCHEL PICKENS FRANKS, P.J.